IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
                        :

UNITED STATES OF AMERICA,       :

                        :

      v.                    :         No. 7:16-CR-832

                        :

NICHOLAS TARTAGLIONE,       :

                        :

      Defendant.        :         (Judge Karas)

                        :

-------------------------------------------------------x

**REPLY TO OPPOSITION TO DEFENDANT'S MOTIONS IN LIMINE**

Defendant Nicholas Tartaglione hereby replies to the Government's Memorandum of

Law in Opposition to the Defendant's Motions in Limine ("Opposition") (Dkt. 406).  He

reasserts and incorporates by reference each argument in Defendant's Omnibus Motions In

Limine And Memorandum In Support ("Defendant's Motions In Limine") (Dkt. 398).  Below,

Mr. Tartaglione provides a more targeted response to some arguments and assertions the

Government makes in its Opposition.

## I.    THE COURT SHOULD PRECLUDE OTHER BAD ACTS EVIDENCE

The Government's notice-letter of Mr. Tartaglione's alleged bad acts which it may seek to

prove at trial is attached to Defendant's Omnibus Motions In Limine.  Dkt. 398-1 (notice-letter).

The letter contains two sections.  Section I provides (insufficient) notice of nine kinds of bad

acts, and those can be divided into three general categories: (A) paragraphs (1), (3), and (4):

evidence that Mr. Tartaglione illegally distributed a variety of drugs (steroids, sexual function-

enhancing drugs, marijuana, oxycodone); (B) paragraphs (2) & (5): that Mr. Tartaglione  hired

Messrs. ▆▆▆ and Benderoth as muscle in the past to collect debts,  authorizing their use of

violence and intimidation, and Mr. Tartaglione directed them to rob individuals who were transporting marijuana to New York; and (C) paragraphs (6) – (9): that Mr. Tartaglione threatened others, including strangers, and falsely represented that he was an active duty police officer.

## A. The Bad Acts Evidence Should Be Precluded

Mr. Tartaglione contends that the Government's notice-letter provides woefully insufficient notice because it fails to specify the evidence it seeks to introduce, provides no non-propensity purpose for which the Government seeks to introduce the evidence; to articulate any reasoning that supports the purported non-propensity purpose; and to articulate any basis for concluding that the evidence is relevant in light of any non-propensity purpose. Defendant's Motions In Limine at 5.

### 1. Insufficient Notice

#### a. Alleged Bad Acts (1) – (5)

Implicitly conceding Mr. Tartaglione's insufficiency contention, the Government now contends that the first five items in its letter notice "are further fleshed out both in the Government's Jencks Act productions and the Government's motions *in limine*." Dkt. 406 at 9. The Jencks Act material for its three cooperating witnesses, produced on December 13, 2022, "included detailed accounts of the acts identified in the first items in the Notice." *Id.* The Government's motions in limine "provided a detailed account of the evidence the Government will offer at trial and the basis for admission of that evidence." *Id.* at 9-10.

FRE 404(b)(3) requires that the Government "describe the evidence with reasonable particularity 'so that the defendant has a fair opportunity to meet it.'" *United States v. Gamble*, 2022 U.S. Dist. LEXIS 129296 (W.D. Pa. 7/21/2022). Neither the Government's statement that

2

somewhere within its voluminous December 13, 2022, production is the evidence with which it seeks prove the bad acts identified in its notice-letter nor its statement that its motions in limine contain that evidence satisfies the requirement that the Government describe with reasonable particularity the evidence it hopes to use to prove the alleged bad acts. *See United States v. Thomas*, 981 F.Supp.2d 229, 239 (S.D.N.Y. 2013) ("[T]he Government cannot hide *Brady* material as an exculpatory needle in a haystack of discovery materials. *See United States v. Skilling*, 554 F.3d 529, 577 (5th Cir. 2009), *aff'd in part and vacated in part on other grounds*, 561 U.S. 358 (2010) (suggesting that *Brady* violations related to voluminous open file discovery depend on what the Government does in addition to allowing access to a voluminous open file"); *see also United States v. Hsia*, 24 F.Supp. 2d 14, 29-30 (D.D.C. 1998) ("The Government cannot meet its *Brady* obligations by providing . . . 600,000 documents and then claim that [the defendant] should have been able to find the exculpatory information[.]")).  If the Court is not inclined to grant the defense motion to preclude any bad acts evidence based on the Government's initial insufficient notice and its failure to cure that insufficiency in its Opposition, Mr. Tartaglione asks that it order the Government to provide forthwith a clear and direct statement of the evidence that it seeks to introduce to prove the alleged bad acts identified in the notice-letter.

Mr. Tartaglione is aware, of course, that the Government's motions in limine contain, at pages 8 through 9, a statement of anticipated testimony from ███ ███ Dkt. 396 at 11-13 (Argument I.A.).  It may be that the Government intends to limit the evidence it will seek to introduce as proof of the first five identified bad acts to the evidence described in Argument I.A. of its motions in limine. *Id.*  But Mr. Tartaglione is, of course, unable to know this absent the Government saying so.  Were the Government to say so, Mr. Tartaglione would agree that the

3

evidence it intends to rely on as proof of bad acts (1) – (5) is sufficiently identified for FRE

404(b)(3) purposes.  Absent such a statement, the Government's notice is plainly insufficient.

### b. Alleged Bad Acts (6) – (9)

The Government correctly notes that its notice-letter's paragraphs (6) – (9) each reference

"the precise pages in prior discovery productions where the defendant can locate more detailed

descriptions of the specified acts."  Dkt. 406 at 10.   FRE 404(b)(3) requires notice of the

"*evidence* that the prosecutor intends to offer at trial." *Id.* (emphasis added).  However, the

discovery pages referenced in paragraphs (6) though (9) are all police reports from which the

Government has redacted the names of the witnesses to the alleged bad acts.  Thus, while the

discovery pages, as compared to the notice-letter, does more precisely describe the bad acts

which the Government seeks to prove, they do not describe with particularity sufficient to allow

meaningful investigation into the evidence with which the Government hopes to prove those

acts.  This is because they fail to provide the name(s) of the percipient witness(es) through whom

the Government seeks to prove each of the alleged bad acts.  *United States v. Gamble*, 2022 U.S.

Dist LEXIS 129296 (W.D. Pa. 7/21/2022); *United States v. Padilla-Galarza*, 2022 U.S.Dist.

LEXIS 71967 (D.P.R. 4/18/2022).  (While the police reports do contain the names of reporting

officers and supervisor officers, those officers' statements recounting the statements of others

and, thus, officer statements contained in the reports recounting the complainants' statements

constitute inadmissible hearsay.  *See*, *e.g.*, *United States v. Carneglia*, 256 F.R.D. 384, 391

(E.D.N.Y. 2009) ("Separate from the inquiry into the admissibility of the police reports

themselves is the question of the admissibility of their contents.").  The precise pages in prior

discovery productions on which the Government relies do not cure the notice deficiency.

Likewise, the Government's reliance on its in limine motions to cure the deficiency as to the acts

4

identified in the notice-letter's paragraphs (6) through (9) fails because those motions do not identify the witness(s) through whom it seeks to prove the alleged bad acts. *See* Dkt. 406 at 10-11.

Further, respecting bad acts (6) and (7), the Government notes that while it does not "[a]t this time seek to present evidence of these incidents in its case-in-chief at trial," it "does anticipate . . . that other unnamed witnesses, including all three cooperating witnesses, will testify that the defendant represented himself as a police officer to them and, at times, wore a police badge." Dkt. 406 at 16. Nowhere in its letter-notice, in its motions in limine, or in its Opposition does the Government identify any "permitted purpose for which [it] intends to offer the evidence and the reasoning that supports the purpose." FRE 404(b)(3)(B). Further, as already established, the "precise pages in prior discovery productions" referenced in letter-notice paragraphs (6) and (7) are police reports from which the complainants' names are redacted. Finally, the letter-notice did not provide any notice of any "other" witnesses who "will testify that the defendant represented himself as a police officer to them and, at times, wore a police badge." Aside from being late, this new notice contained in the Opposition is hardly notice at all: it neither identifies with reasonable specificity the particular alleged bad acts the Government seeks to prove nor identifies the "other" witnesses from whom it seeks to elicit the evidence. For all these reasons, the letter-notice's paragraphs (6) and (7) and the similar but new notice of "other" witnesses are clearly insufficient. *United States v. Gamble*; *United States v. Padilla-Galarza*. The Court should preclude the Government from introducing evidence in support of the bad acts alleged in the notice-letter as well as the similar bad acts alleged in the Government's Opposition (Dkt. 406 at 9).

If the Court is inclined to allow the Government to introduce evidence tending to prove any of alleged bad acts (6) – (9), Mr. Tartaglione asks that the Court direct the Government to forthwith supply unredacted copies of the referenced reports so that he may have a fair opportunity, as guaranteed by the Fifth Amendment's due process clause, to meet the Government's evidence by conducting necessary investigation.

## 2. Insufficiency Aside, The Court Should Preclude Evidence Of Identified Alleged Bad Acts (1) Through (5), (8), & (9)

The Government provides several non-propensity purposes for introducing evidence regarding each of these alleged acts. Mr. Tartaglione's supposed drug dealing and debt collection with ▮▮▮▮ and Benderoth "is essential to the jury's understanding of the events charged in the Indictment" because they explain the alleged historical relationship between ▮▮ Benderoth, ▮▮ and Tartaglione. Opposition at 6. The Government contends that "brief testimony from" ▮▮ and "a small selection of text messages seized from cellphones" will serve the identified purposes.

Mr. Tartaglione argues in his Defendant's Motion in Limine as well as his Opposition to the Government's Motions to Preclude (Dkt. 405), that the evidence of Mr. Tartaglione's years-long involvement in steroids sales with his co-conspirators is sufficient to provide context for the nature of the relationship between the parties. ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮.

███████████ ██ ████████████████████

████████████████████████████████

██████ ██ ████████████████████

█████████████████████████████

█████████████████████████████

████████ ██ █████████████████████

██████████████████████████████████

██ ██ █████████████████████ Thus, evidence that Mr. Tartaglione hired Mr.

███ to collect debts and authorized the use of violence in the past is not necessary to establish

why Mr. Tartaglione asked ██ ██ to investigate the missing money and facilitate a ruse so

that Mr. Tartaglione himself could confront Martin Luna. ██ ██ friendship with Mr.

Tartaglione, his notable size and strength, and their years-long steroid trafficking venture is

sufficient to explain why Mr. Tartaglione would have asked him to assist in this unique situation

without causing undue prejudice to his case[1].

Further, the Government's reliance on *United States v. Dupree*, 870 F.3d 62, 74-77 (2d 2017)

is misplaced. There, the Court reasoned that the evidence was admissible as probative evidence

---



of defendants' knowledge of the charged drug- and murder-related acts, their intent to engage in these acts, and the development of their relationships with each other because both codefendants disputed at trial that they had a prior joint criminal relationship. *Id.* at 76 ("Second, contrary to Brian's arguments, at trial the parties disputed the nature of defendants' relationships and their intent to sell drugs together. Brian claimed he sold drugs as an individual dealer in the "free zone" around the 160 Park Hill building, where it was "every man for himself." Gov't App. 40-41. Samuel asserted that his relationship with Brian was familial, not criminal, and did not involve any joint narcotic conduct.")  This case stands in stark contrast: Mr. Tartaglione does not dispute that he sold and supplied ▮▮▮▮ ▮▮▮▮ and Benderoth with steroids for personal use and sale, and that evidence is sufficient to provide context for the Government's explanation of the partis' relationship without providing undue prejudice to the defendant. Moreover, and again in contrast to *Dupree*, Mr. Tartaglione's alleged intent to engage in the alleged acts of drug trafficking, kidnappings, and murder is evident in the alleged conduct. While Mr. Tartaglione in no way concedes any of the conduct charged in the indictment, to the extent that the Government introduces evidence that Mr. Tartaglione gave money to a co-conspirator to purchase cocaine, directed that the victims be brought to his property against their will, and strangled one and shot another, the intent to commit these acts is apparent in the conduct. Thus, *United States v. Dupree* is clearly distinguishable from the instant facts.

The Government notes that "the continued criminal activity after April 11, 2016, proves that the defendant continued his relationship of trust with ▮▮▮▮ ▮▮▮ and Benderoth even after the murders, corroborating ▮▮ ▮▮▮ testimony that all three of the co-conspirators participated in the murders of the victims together and trusted each other not to go to law enforcement."  Dkt. 406 at 13.  On the contrary, while the alleged criminal activity after April 11 is not inconsistent

with ██ ████ testimony, that by itself does not support the testimony because the alleged continuing activity in no way indicates who participated in the murders (and, therefore, whether they trusted each other not to go to law enforcement). ██ ████ testimony that ██ continued to purchase steroids from Mr. Tartaglione after the murders is more than sufficient to establish the same, though, this evidence is also not relevant to proving the murders. ██ ████ will testify that each party shot one of three victims. That they were all equally implicated in those murders is sufficient to establish that they trusted one another not to go to law enforcement.

As for the acts in the letter-notice's paragraphs (8) and (9)—threatening his landlord's lawyer in March 2016 and threatening a storage facility employee—the Government contends that their purpose is to prove Mr. Tartaglione's "financial motive for kidnapping and killing Martin Luna." Dkt. 406 at 14. Aside from the Government's insufficient notice—insufficient because the Government has not identified the witnesses from whom the Government seeks to elicit the testimony—the statements attributed to Mr. Tartaglione are on their face neither threats nor financially motivated. They could be either or both, but additional evidence is needed to determine whether they are either. If the statements were not threat, they are irrelevant. The Supreme Court has long held that in determining whether the record evidence is sufficient to satisfy FRE 104(b), trial courts must "examine[] all the evidence" and determine whether the jury "could reasonably find the conditional fact . . . by a preponderance of the evidence." *Huddleston v. United States*, 485 U.S. 681, 690 (1988). Here, without more evidence, a jury could not reasonably find that the statements attributed to Mr. Tartaglione were either threats or financially motivated, a fact on which the statements' relevance depends. It could be, for example, that the statements were expressions of frustration caused by his belief that the landlord had unfairly refused to allow him to purchase the subject property in an installment sales

9

agreement or an option to buy exercisable at the end of the lease. *See* Exhibit 1 (Tartaglione letter to court requesting stay pending appeal). Also, the fact that in April 2016 Mr. Tartaglione deposited $12,000 (representing $3,000 rent per month) and the $500 judgment with the court is strong evidence that Mr. Tartaglione's alleged statements—i.e., the so-called threat—did not reflect and, so, do not tend to prove financial desperation, a condition necessary to the statements being relevant to the Government's purpose. *See* Exhibit 2 (Stay of Warrant of Eviction).

The alleged threat to the storage facility employee is similarly troublesome. The "precise page[] in prior discovery productions" that the notice-letter references does not provide the complainant's name. Exhibit 3 (police report). Equally important, it provides nothing more than the conclusory statement that Mr. Tartaglione "threatened him over the phone." *Id*. It provides no context tending to prove that the statements were made out of financial desperation as opposed to, e.g., frustration with being misbilled or with being harassed after a single delayed payment.[2] Indeed, the police report relates only that the alleged threat was made during a conversation about a past due account, not that it was made in resistance to paying the past due account as opposed to, for example, the storage facility's mistaken belief that there was a past due amount owing. Nor does the report provide any foundation for the complainant's bare assertion that the person with whom he spoke on the telephone was Mr. Tartaglione. *Id*. These omissions mean not only that the notice is insufficient, but that there is no basis for concluding that Mr. Tartaglione's alleged statements were threats –a fact on which the alleged statements' relevance to the Government's stated purpose of proving Mr. Tartaglione's financial desperation depends.

---

[2] Customers routinely demonstrate frustration with telephone companies and credit card agencies when discussing their bills during recorded customer service telephone conversations. The frustrations are often nothing to do with financial desperation but rather how the customer service representative treats the customer or how they were billed.

On the evidence before the Court respecting each alleged threat, a jury could not reasonably find the conditional facts—that the statement were threats, that the statements were financially motived, and (in the case of the storage facility) that the person who allegedly made the statements was Mr. Tartaglione—necessary for the statements to be relevant. *Huddleston v. United States*, 485 U.S. 681, 690 (1988). Because the evidence of both alleged bad acts is not relevant, the Court should prohibit the Government from introducing it.

Further, the Government's purported purpose for introducing evidence of Mr. Tartaglione's financial desperation as his motive for hunting down and killing Martin Luna for the loss of his investment is not necessary to prove its case. It can do so with less prejudicial and relevant evidence—██ ██ will claim that Tartaglione was angry about the loss of his investment and ██ and other witnesses will allege that Tartaglione indicated that it was all the money he had left. In addition, the Government can provide bank records demonstrating that Mr. Tartaglione was indigent. These two incidents the Government seeks to introduce are highly prejudicial because they serve as classic propensity evidence—demonstrating that Mr. Tartaglione acts irrationally and in a volatile manner when it comes to financial matters. The threat to Guardian storage should additionally be precluded because it occurred after the murders. Mr. Tartaglione's state of mind after the instant offenses is not relevant. To the extent that it has any probative worth, which it does not, it is far outweighed by its prejudicial effect. The Government's argument that the acts are no less inflammatory than the instant offense and citations are not on point. In *United States v. Livoti*, 196 F.3d 322 (2d Cir. 1999), cited by the Government, a prior choke hold was deemed admissible because the defendant opened the door by asserting that the instant choking was unintentional and then the court weighed the prejudice and determined it was not more inflammatory than the instant allegation. Mr. Tartaglione has

not opened the door through his testimony. The prosecution should be prohibited from introducing these two acts in its case-in-chief.

## II. The Government Should Be Prohibited From Inquiring Into Alleged Prior Instances of Dishonesty, Should Mr. Tartaglione Testify

Section II of the Government's December 13, 2022, notice-letter relates that if Mr. Tartaglione testifies, the Government intends to cross-examine him on seven instances of alleged dishonesty. The Government's withdrawing in its Opposition the notice-letter's second instance of alleged dishonesty leaves six other instances—paragraphs (1) and (3) – (7)—on which it seeks to cross-examine Mr. Tartaglione, should he testify.

FRE 608 provides the Court discretion to allow proving a witness' character for truthfulness or untruthfulness through cross-examination into specific instances of the witness' conduct. The Court should exercise its discretion to forbid the Government from making that inquiry, particularly regarding paragraphs (3) and (5).

First, paragraph (3) identifies an instance where Mr. Tartaglione supposedly committed perjury at a DMV administrative hearing. The Government acknowledges that Mr. Tartaglione was prosecuted for that alleged perjury but acquitted; yet it claims that because "a federal judge in this District later found in a civil suit that the evidence provided probable cause to believe that the defendant had in fact perjured himself at the hearing," it should be allowed to ask Mr. Tartaglione whether he lied at the hearing. Dkt. 406 at 19. The Government's position contradicts settled Fifth Amendment Double Jeopardy and Due Process law. *Yeager v. United States*, 557 U.S. 110, 119 (2009) ("the Double Jeopardy Clause precludes the Government from relitigating any issue that was necessarily decided by a jury's acquittal in a prior trial") (relying on *Ashe v. Swenson*, 397 U.S. 436, 446 (1970)); *United States v. Mespoulede*, 597 F.2d 329, 334 (2d Cir. 1979) (requiring relitigation of "the very issue a jury decided in his favor" could not be

12

squared with "fundamental considerations of fair play" and "introduction of such evidence meant that this defendant was subject to a second risk of conviction for his actions"). The Court should prohibit the Government from inquiring of anyone or otherwise putting on any evidence tending to show that Mr. Tartaglione lied at the DMV administrative hearing.

Second, paragraph (5) identifies an instance where Mr. Tartaglione allegedly "lied when he was questioned by police regarding a traffic incident during which he falsely represented himself to be an *active* duty police officer. *See* NT_015232 through NT-015233." Notice-Letter at 2 (emphasis added). The referenced pages, a New York State Police Incident Report, are attached as Exhibit 3. The complainant stated that she and Mr. Tartaglione had a minor car accident with minimal to no damage, that they both pulled over, and that Mr. Tartaglione got out of his car and approached her. According to the complainant, Mr. Tartaglione "identified himself as a police officer" but only "by displaying what appeared to be a police shield," not by saying he was a police officer. The complainant saw a German Sheppard in the back of Mr. Tartaglione's car. The reporting officer contacted Mr. Tartaglione, who explained that he was taking his dog for emergency veterinary care at the time of the accident. He related that he had exited his car to explain his emergency to the other driver, and showed her his driver's license next to which he keeps his Briar Cliff Manor Police Department *retired Shield 103*. He did not recall identifying himself as a police officer at all but stated that, if he did, it would have been only to reassure her that he was not a threat and to explain why he could not stay at the scene. The reporting officer confirmed that in less than 15 minutes after the incident, Mr. Tartaglione himself called 911, "identified himself and stated that he had been involved in a PDAA and had left the scene in order to bring his canine to the vet and requested some type of entry be made reflecting that." Exhibit 3 at 2. Displaying a retired Shield 103 is not identifying oneself as an

13

active-duty police officer. The is nothing in the police report tending to show that Mr. Tartaglione lied when "questioned by the police regarding [the] traffic incident." The assertion that Mr. Tartaglione lied is unfounded, and the Court should prohibit the Government from inquiring about it.

If the Court is inclined to allow the Government to inquire about alleged instances (4) or (5), Mr. Tartaglione asks that the Court direct the Government to forthwith supply unredacted copies of the referenced reports so that he may have a fair opportunity, as guaranteed by the Fifth Amendment's due process clause, to meet the Government's evidence by conducting necessary investigation.

## III. The Court Should Preclude The Government From Introducing Evidence About Mr. Tartaglione's Two Statements Referencing Mexicans.

The Government asserts that Mr. Tartaglione's statements demonstrate consciousness of guilt. According to the Government his first statement was entirely spontaneous because

> [u]p until that point in the defendant's interactions with law enforcement that day, no member of law enforcement had mentioned the victims in this case, all of whom were of Mexican descent, or any missing persons. Instead, law enforcement had used a ruse to explain their contact with the defendant, falsely claiming that the defendant's car was reportedly involved in a road rage incident that law enforcement was investigation. The defendant's statements thus brought up the victims for the first time in that interaction with law enforcement and reflect the defendant's awareness both that he had knowledge of the victims' disappearance and that law enforcement would want to question the defendant about their disappearance.

Dkt. 406 at 24. But the premise running throughout this narrative, that Mr. Tartaglione was the first to introduce the subject of Mexicans, is demonstrably false. As part of its discovery obligation, the Government has produced a ███████ ████████ ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

14



Minutes later, Mr. Tartaglione was stopped and placed inside a New York State Police vehicle.  Within a minute, an investigator entered the vehicle and Mr. Tartaglione asked, "This is about the missing Mexicans, isn't it?" ████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████ it did not require genius on Mr. Tartaglione's part to connect the dots.  Under these circumstances, Mr. Tartaglione's seeking confirmation that he was correct in thinking that the police were contacting him "about the Mexicans" in no way reflects consciousness of guilt or otherwise tends to prove that he is guilty of any of the charged offenses.

Mr. Tartaglione maintains that his second statement should be precluded for the reasons argued in his motions in limine.

IV.     THE COURT SHOULD PRECLUDE THE TEXT MESSAGES BETWEEN
        MESSRS. BENDEROTH AND TARTAGLIONE

The Government acknowledges that it "has not yet identified the particular text messages it will [seek to] introduce at trial." Dkt. 406 at 25. Mr. Tartaglione asks that the Court direct the Government to provide the text messages it will seek to introduce so that he may articulate text-message-specific reasons for their preclusion.

For now, Mr. Tartaglione relies on the arguments in his Defendant's Motions In Limine and notes that a large number of text-messages were deleted from Mr. Benderoth's cell phone. It appears, therefore, that it may be impossible to discern the context and, consequently, the meaning of the surviving texts. As the Government acknowledges, Mr. Tartaglione cannot make particularized arguments regarding the text-messages between Messrs. Benderoth and Tartaglione in advance of the Government's identifying which texts it will seek to introduce.

V.      MR. TARTAGLIONE HAS SET FORTH A GOOD FAITH BASIS TO
        PRECLUDE TESTIMONY OR REFERENCE TO THE COOPERATING
        WITNESSES' PROMISE TO TESTIFY TRUTHFULLY.

In its Opposition, the Government contends that testimony from cooperating witnesses about provisions in their cooperation agreements to testify truthfully does not constitute improper vouching.[3] Although tersely catchy, its position is incorrect.

While omnipresent in criminal prosecutions, incentivized testimony by cooperators must always be carefully scrutinized to ensure a criminal defendant's right to a fair trial. *See*, *e.g.*, *On Lee v. United States*, 343 U.S. 747, 757 (1952) (noting "the use of informers, accessories, accomplices, false friends, or any of the other betrayals which are 'dirty business' may raise

---

[3] "Improper vouching occurs when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the office of the United States Attorney behind that witness." *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999).

serious questions of credibility."); Alexandra Natapoff, *Beyond Unreliable: How Snitches Contribute to Wrongful Convictions*, 37 Golden Gate U.L. Rev. 107 (2006).  Beyond improper summations, courts have found that a witness's direct examination testimony about the terms of their plea agreement to testify truthfully, may amount to improper vouching.  *See United States v. Brooks*, 508 F.3d 1205, 1210 (9th Cir. 2007) (vouching can occur on direct examination of cooperating witness testifying that their plea agreement requires truthful testimony).[4]  To that end, there is a need for caution in permitting the Government to admit evidence about a cooperating witness' "testify truthfully" clause in a plea agreement.  *See United States v. Roberts*, 618 F.2d 530, 536 (9th Cir. 1980) ("a trial court should be alert to the problem of vouching before admitting a plea agreement containing a promise to testify truthfully.").

Here, the Government's case is heavily dependent on the credibility of its cooperating witnesses.  ███ ███ ███ and ███████ are all obligated under their respective plea agreements to testify truthfully.  "Vouching is especially problematic in cases where the credibility of the witnesses is crucial." *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993).  Moreover, eliciting the "testify truthfully" provision of the plea agreement is merely superfluous and can be nothing more than vouching in disguise.  Of course, prior to taking the stand to testify, every witness is obligated under oath to tell the truth.  The Government's reference to some additional obligation implies it has some way to ensure only the

---

[4]  Improper vouching by prosecutors often occurs in opening and closing arguments.  *See, e.g., United States v. Certified Environmental Services, Inc.*, 753 F.3d 72, 87-88, 94-95 (2d Cir. 2014) (reversing in part because prosecutor improperly bolstered witnesses in opening and closing based upon immunity agreements, including by arguing that the Government included truth-telling language in agreements because "[w]e wanted to ensure that people taking the stand provided the truth."); *United States v. Washington*, 263 F. Supp. 2d 413, 433 (D. Conn. 2003) (new trial granted in part because after Government's summation the jury may have found the prosecutor's personal views on whether the witness was truthful).

incontrovertible truth comes out of that witness' mouth. Such actions should not be countenanced and potentially prejudices the integrity of the trial.

## VI.    THE COURT SHOULD PRECLUDE ANY ENHANCED SECURITY MEASURES DURING TRIAL DISCERNIBLE TO JURORS

The Fifth Amendment's Due Process Clause guarantees Mr. Tartaglione the right "to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial." *Taylor v. Kentucky*, 436 U.S. 478, 485 (1978). Due process also requires that before allowing the deployment of "physical restraints or other types of courtroom security," district courts must determine on the record whether the security measures are "necessary to maintain safety or security." *United States v. Eldridge*, 2 F.4th 27, 34 (2d Cir. 2021). A district court's delegating the decision or giving no reason for the decision is an abuse of discretion. *See United States v. Haynes*, 729 F.3d 178, 189 (2d Cir. 2013).

The Fifth Amendment due process guarantee forbids restraining a defendant through means discernible to jurors during a criminal trial, an extreme and inherently prejudicial measure, unless the trial court first determines that the restraints are justified by an essential state interest specific to the defendant on trial. *Deck v. Missouri*, 544 U.S. 622, 629 (2005). Though somewhat less demanding scrutiny applies to other security measures deployed at a criminal trial, the Fifth Amendment guarantee requires that the trial court must evaluate those measures on a case-by-case basis. *Eldridge; Haynes; see Holbrook v. Flynn*, 475 U.S. 560, 568-69 (1986).

There is no evidence that any enhanced security—e.g., the use of x-ray screening, metal detectors, uniformed marshals or other law enforcement, or physical restraints on Mr. Tartaglione—is necessary to maintain safety or security or needed to protect any other legitimate Governmental interest. Indeed, Mr. Tartaglione has attended many court hearings over the last

18

six years without incident, always respectful of and compliant with instructions from the Marshals Service. Nor is there any evidence-based reason to believe that any enhanced security measure is needed to maintain courtroom security and order against any member of the public.

Jurors are monitored by bailiffs and court personnel to make sure that they are not influenced improperly. Given the great care taken to protect juries and the lack of knowledge about courtroom security, any enhanced security measures could easily lead jurors to make a negative judgment on Mr. Tartaglione that he is dangerous and consider that as evidence of guilt, in violation of the Fifth Amendment due process guarantee.

## VII. THE GOVERNMENT HAS OFFERED NO LEGITIMATE JUSTIFICATION TO OPPOSE COUNSEL'S MOTION IN LIMINE FOR EQUAL TREATMENT REGARDING THE MAGNETOMETER SCREENING.

In what was anticipated to be an uncontroversial request of permitting counsel for Mr. Tartaglione equal treatment as Government counsel of bypassing the magnetometer screening, the Government engages in a no holds barred approach in an attempt to defeat a simple device aimed solely at ensuring the shared interest in the fairness of the trial proceedings. The Government bases its opposition upon a distinction it makes between itself and defense counsel, namely, that they have been subject to intensive background checks. In elevating its purported trustworthiness over that of defense counsel, the Government unwittingly makes defense counsel's rationale for the defense request.

To safeguard the presumption of innocence, trial courts must be alert to all kinds of factors that may undermine the fairness of the fact-finding process. *See Estelle v. Williams*, 425 U.S. 501, 503 (1976).[5] In *Estelle*, the Supreme Court emphasized the need to scrutinize all aspects of courtroom practices. The Court stated:

---

[5] The facts of *Estelle* involved the effect of a defendant wearing prison garb during trial.

19

[t]he actual impact of a particular practice on the judgment of jurors cannot always be fully determined. But this Court has left no doubt that the probability of deleterious effects on fundamental rights calls for close judicial scrutiny. Courts must do the best they can to evaluate the likely effects of a particular procedure, based on reason, principle, and common human experience.

*Id*. at 504 (internal citations omitted).

Consequently, courts must scrutinize any practice when there is a probability that those practices may negatively impact a criminal defendant's right to a fair trial. This is true of the signal that unequal treatment of counsel passing through the magnetometer sends to the jury that Government counsel is more trustworthy and reliable and therefore, disadvantages Mr. Tartaglione.[6] Such subtle message amounts to "striking a defendant over the shoulders of his counsel." *Cartwright v. Dretke*, 103 F. App'x 545, 548 n.2 (5th Cir. 2004) (internal citation omitted).[7]

//

//

//

//

//

//

//

//

---

[6] In addition to counsel having to remove clothing, including shoes and pass through the magnetometer, counsel must also place all of their trial materials through it. At times, counsel must endure further scrutiny and be subjected to a second round of hand wand magnetometers.

[7] Despite the Government's assurances that the jurors will inevitably conclude that any distinction in treatment between counsel is innocuous, jurors are generally not aware of the courtroom customs and protocols. Indeed, a juror's lack of knowledge can cause them to draw any number of conclusions.

20

## CONCLUSION

The Court should grant the relief sought in Defendant's Omnibus Motion In Limine for all the reasons set forth there and for all the reasons above.

Dated: February 6, 2023

BARKET EPSTEIN KEARON ALDEA & LoTURCO, LLP

By:    s/ Bruce Barket
Bruce Barket
Aida Leisenring
666 Old Country Road, Suite 700
Garden City, NY 11530
(516) 745-1500
bbarket@barketepstein.com

MIELE & RYMSZA, P.C.

By:    s/ Edward J. Rymsza
Edward J. Rymsza, Esq.
Pa. I.D. No. 82911
*Pro Hac Vice*
Attorney for Defendant
125 East Third Street
Williamsport, PA  17701
(570) 322-2113
(570) 322-8813 (facsimile)
Rymsza@comcast.net

OLIVER W. LOEWY, ESQ.

BY:    s/ Oliver W. Loewy
Oliver W. Loewy
Illinois Bar 6197093
*Pro Hac Vice*
1022 SE 30th Avenue
Portland, Oregon 97214
(208) 283-5381
oliverwloewy@gmail.com