```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2
    ------------------------------------x
 3  UNITED STATES OF AMERICA,

 4
                              Case No. 16-cr-832
 5       -vs-
                              STATUS CONFERENCE
 6  NICHOLAS TARTAGLIONE,

 7                       Defendant.

 8  ------------------------------------x

 9                           United States Courthouse
                             White Plains, New York
10                           January 11, 2022

11                  ** VIA TELECONFERENCE **

12  B e f o r e:  HONORABLE KENNETH M. KARAS
                              United States District Judge
13
    A P P E A R A N C E S:
14
    DAMIAN WILLIAMS
15       United States Attorney for the
         Southern District of New York
16  JASON SWERGOLD
    JACOB FIDDELMAN
17       Assistant United States Attorneys

18  BRUCE BARKET
    AIDA LEISENRING
19       Attorneys for Defendant

20  EDWARD RYMSZA
    ARIELLE EGAN
21       Attorneys for Defendant

22  CARL SCHWARTZ
    ARIELLE EGAN
23       Attorneys for Defendant

24  ALSO PRESENT:

25  FBI Special Agent Jessica Miller
```

011122.1                    PROCEEDINGS

1              THE COURT:  Good morning.

2              THE DEPUTY CLERK:  Good morning, Judge.  United States

3    of America versus Nicholas Tartaglione, 16-cr-832.

4              Mr. Tartaglione, please state your full name.

5              THE DEFENDANT:  Nicholas Tartaglione.

6              THE DEPUTY CLERK:  Thank you.

7              Counsel for the government?

8              MR. SWERGOLD:  Good morning, Your Honor.  Jason

9    Swergold and Jacob Fiddelman for the government.

10             THE DEPUTY CLERK:  We also have FBI Agent Jessica

11   Miller for the government.

12             And counsel for defendant?

13             MR. BARKET:  For Nicholas Tartaglione, it's Bruce

14   Barket and Aida Leisenring.

15             MR. RYMSZA:  And this is Edward Rymsza on behalf of

16   Mr. Tartaglione.

17             MR. SCHWARTZ:  Good morning, Your Honor.  This is Carl

18   Schwartz, along with Arielle Egan, on behalf of Mr. Tartaglione.

19             THE COURT:  All right.  Anybody else?  All right.

20             Good morning again, everybody.

21             Mr. Barket, in light of the spike in COVID cases, I

22   thought it made sense to at least explore the possibility of

23   doing this conference telephonically.  Does your client

24   understand his right to have this conference done in person, and

25   is he willing to waive that right and proceed telephonically?

OFFICIAL COURT REPORTER
DARBY GINSBERG, RPR (914) 390-4102

```
 1              MR. BARKET:  Yeah.  Yes, Your Honor.

 2              THE COURT:  Okay.  Government, let's start with any

 3   updates from you.

 4              MR. SWERGOLD:  Thank you, Your Honor.

 5              From the government's perspective, there is only one

 6   item for us on the agenda, which is, following the last

 7   conference, we -- the parties met and conferred regarding the

 8   intermediate deadlines that would take us up to a March 2023

 9   trial date.  Last week we submitted a proposed schedule to Your

10   Honor with all agreed-upon dates except for the length of time

11   between the guilt phase and any penalty phase.  And so from our

12   perspective, I think the only thing we are asking for the Court

13   today is to order that schedule.

14              THE COURT:  Okay.

15              All right.  Mr. Barket?

16              MR. BARKET:  Your Honor, we are, I think, in agreement

17   on everything except that which we haven't staked out a position

18   on yet, which is the length of time between the liability, and

19   if there is going to be a penalty phase, that phase.

20              Our -- as I am sure you recall when we were last in

21   court, I noted that we were seeking four weeks, but that was

22   really kind of a prophylactic request if you will.  There are

23   some considerations that might lead us to request that, but we

24   are not sure at this point that we will need to.  So we are just

25   going to ask that Your Honor put an asterisk on that part of it,
```

1  and we will revisit it in the months to come, I am sure well in

2  advance of when we need to notify the jurors.

3          THE COURT:  Okay.  And when we were last -- at our

4  last conference, Mr. Barket, you had also indicated that there

5  was going to be some activity from you and your team with regard

6  to applications towards the Justice Department, and is that

7  still the case?

8          MR. BARKET:  Absolutely, Your Honor.  We've taken some

9  steps internally, and we expect to move forward on that front

10 relatively quickly.  We've consulted with resource counsel and

11 some other sources to best position ourselves to have that be

12 successful, and obviously, we hope it will be, but we will wait

13 and see.

14         THE COURT:  But it's clear that this is going to be a

15 two-track approach.  So whatever you are going to be doing on

16 that front is not affecting the schedule that you and the

17 government have agreed to with the one asterisk related to the

18 time between the guilt phase and if there is to be a penalty

19 phase?

20         MR. BARKET:  Correct.  Correct, Your Honor.  There is

21 no -- we -- I don't want to say when we will submit the

22 application, but I expect it will be, relatively speaking, soon.

23         THE COURT:  Yes.

24         MR. BARKET:  And the proposed schedule, as you can

25 see, is more active from the Court's perspective later; and from

1  our perspective, this time period between now and, say, the

2  spring is going to give our learned counsel an opportunity to

3  become thoroughly familiar with the file, and we will move

4  forward; but the application to the Justice Department to de-

5  authorization will be made well in advance of any activity in

6  court.  When the Justice Department will respond to that, of

7  course, we can't -- we can't know.

8          THE COURT:  Yeah, I'm not -- the only reason I am

9  asking is I just want to make sure we are all clear that the

10 schedule that has been proposed is going to be the schedule that

11 is going to govern this case, and that whatever you are going to

12 do with respect to the Justice Department, whenever the Justice

13 Department responds, is a separate thing that will be pursued.

14 I just want to make sure we are all committed to this schedule.

15         MR. BARKET:  We are, assuming it's a capital case, in

16 other words, if it's a death penalty case.  If the case is de-

17 authorized --

18         THE COURT:  Obviously.

19         MR. BARKET:  -- that eliminates large segments of this

20 litigation, and we would undoubtedly look to try the case much

21 sooner.

22         THE COURT:  Right.  I mean, right now it is a capital

23 case, and that's what this schedule assumes, and that's what I

24 just want to make sure, that everybody is committed to this

25 schedule.  Obviously, if there is a change, then we can revisit

1  it; but for now, this is the schedule --

2          MR. BARKET:  Yes, Your Honor.

3          THE COURT:  -- that we are going to have.  Okay.  All

4  right.

5          Any other issues, Mr. Barket, that you want to raise

6  from your client's perspective?

7          MR. BARKET:  Well, there's a couple of issues, Judge,

8  that I think our learned counsel is going to address with

9  respect to our client's ability to access the discovery, and

10  I -- on that front, I will note for Your Honor, just to refresh

11  everybody's memory, this has been an ongoing kind of problem

12  because of the restrictions in the facility and

13  Mr. Tartaglione's access to a computer.  He doesn't have a paper

14  file.  He has some papers, but the file is largely contained on

15  a hard drive that he needs a computer to view, and the access to

16  that over the last really two years has been extremely limited,

17  and learned counsel is going to address an application we have.

18          And I just note one other thing that the -- when we

19  were last in court, we were hopeful that he would be able to see

20  his mother, who he hasn't seen since I want to say mid November,

21  just a few days after his father's death, and at that point,

22  that was an abbreviated visit.  The jail has not seen fit to

23  permit a visit since then, although his mother's made a couple

24  of trips down there, and now of course the facility is closed to

25  all visiting, including social and legal visits.

1          THE COURT:  Because of the pandemic, because of the

2   spike in the cases.

3          MR. BARKET:  Because of the pandemic.

4          THE COURT:  Yes.

5          MR. BARKET:  But that was -- I think that began in

6   December 23rd.  So there was a good month that went by when his

7   mother, for reasons that -- you know, unrelated -- I don't know,

8   unrelated to pandemic, was not allowed to see her son, and it is

9   what it is.  We -- the day after or day or two after our court

10  appearance, I wrote to the jail and asked for a visit to be

11  arranged.  The email was -- as they typically are from this

12  particular counsel -- ignored entirely, and the visit never took

13  place.  I'm not talking about the government.  I'm talking about

14  counsel for the jail.

15         THE COURT:  No, I understand.  But I think in terms of

16  going forward, I mean, I don't know, is there an application to

17  be made in light of the pandemic?  I don't know.

18         MR. BARKET:  The pandemic kind of, you know, puts a

19  pause on things, right?  I don't -- you know, he needs to see

20  his family as part of our mitigation.  It's part of the defense

21  of the capital case.  That's been --

22         THE COURT:  Yes.

23         MR. BARKET:  That's been a position we have taken

24  since back in the spring of 2019 when he -- visiting was

25  prohibited because of a -- the cellphone violation, and we

1  worked out a protocol then that he would be able to see them on

2  our application, I think it was about once a month, with Adam

3  Johnson, who was very -- I don't want to say cooperative -- but

4  very responsive.

5          THE COURT:  Yes.

6          MR. BARKET:  Since then, the visits have dwindled to,

7  you know, a few times a year; some due to the pandemic and some

8  due to just the nature of the facility.  You'll recall MCC had

9  the problem with security and the gun.  Then the pandemic.  So

10 it's been, you know, an ongoing problem and issue.  Now we are,

11 you know, 14 months away from the start of the trial with no

12 visitation in sight.  If this is going to be an indefinite

13 position of the jail, that they are just going to close all

14 visiting regardless of vaccine status, testing or anything else,

15 we might make an application, but not at this time.  I just

16 wanted to make a note on the record that we are continuing to

17 try to get him to see his family, and that it continues to be a

18 problem.

19         THE COURT:  Okay.  All right.

20         All right.  And then again, you said there is going to

21 be an application with respect to discovery access?

22         MR. BARKET:  Yes.

23         MR. RYMSZA:  Bruce, I can address that.

24         Judge, this is E.J. Rymsza.  Good morning, and happy

25 new year to you.

1          THE COURT:  Happy new year.

2          MR. RYMSZA:  Thank you.  Judge, so as Mr. Barket

3    stated, I mean, there is obviously a very long history with this

4    in terms of Mr. Tartaglione's access to discovery.  He was

5    furnished with an external hard drive that I believe was

6    provided by the government, but because of a whole host of

7    factors, and some of these factors were certainly pre-pandemic,

8    you know, that the computers and access to a computer at MCC was

9    not always available.  Obviously, there were things beyond his

10   control, which included, you know, the number of inmates that

11   also would be trying to access their discovery.  There was very

12   limited time in which he could use that -- use the computer to

13   access the discovery.  I know at least of one instance when I

14   was with him the computer was not even operable.  There's

15   lockdowns.  There's all other kinds of issues that have

16   occurred, and now with the pandemic in full force yet again,

17   there's, you know, pandemic-related lockdowns and lack of

18   movement within the institution and so on and so forth.

19          I think what makes this challenging, too, is now the

20   clock is really running for all of us, particularly learned

21   counsel who is new in the case, and, you know, I think now is

22   really -- time is of the essence.  So what we would be asking

23   for, Judge, is an order authorizing CJA funds to purchase a

24   laptop, and then order MDC to permit Mr. Tartaglione maximum

25   possible use to use that laptop to be able to access his

1  discovery.

2          I don't think the request, Judge, is out of sorts.

3  Certainly, you may be aware that some of your colleagues in the

4  Southern District have permitted this:  Judge Halpern, Judge

5  Román, and in the Eastern District, Judge Komitee, particularly

6  in -- a defendant who is at MDC.  So it's clear that MDC can

7  accommodate this request.  They have done it.  Certainly, there

8  are protocols that would need to be put in place.  You know,

9  this -- and when I say a laptop, Judge, I certainly mean an

10 internet-disabled laptop; and certainly there would be, you

11 know, security measures in place in terms of storing the laptop,

12 where it's getting charged, and other restrictions that wouldn't

13 pose any type of security concerns for the institution.

14         So we think -- we think that's a reasonable request.

15 I think it will be extremely helpful and needed for

16 Mr. Tartaglione to prepare and assist all of us in his defense.

17         So I would propose, Judge, submitting to you a

18 proposed order authorizing both the authorization to procure CJA

19 funds and also to order MDC to permit Mr. Tartaglione maximum

20 access and use of the laptop.

21         THE COURT:  Have you bounced this off the U.S.

22 Attorney's Office to see if they have been in touch with MDC

23 counsel to just try to grease the skids on this?

24         MR. RYMSZA:  So, Judge, I guess with the first

25 request, obviously, they don't have any dog in the fight for

1    funding.  But in terms of giving the access to MDC, I -- it was

2    mentioned in passing in our last conversation with the

3    government, but the -- just my feeling was there was going to be

4    some resistance on that part.  I have not reached out any

5    further to government counsel or to counsel at MDC.

6              THE COURT:  Well, I agree with you on the sort of

7    standing to object to the purchase of a laptop and just funding

8    for Mr. Tartaglione's defense.  I am just trying to make sure

9    that the laptop gets used, and so that was the only reason.

10             So, Mr. Swergold, do you have a reaction, not to the

11   funding piece of it, but to getting it to Mr. Tartaglione in the

12   MDC?

13             MR. SWERGOLD:  Your Honor, I think Mr. Fiddelman is

14   going to address discovery issues if that's okay with the Court.

15             THE COURT:  Sure.  That's fine.  Go ahead, Mr.

16   Fiddelman.

17             MR. FIDDELMAN:  Thank you, Your Honor.

18             So first, as a general matter, we agree that

19   Mr. Tartaglione needs to be able to access and review discovery,

20   as does every inmate in the MDC, and obviously, there are

21   limitations in order to ensure sort of equal distribution of

22   time on computers and things like that.

23             Our understanding of the other circumstances in which

24   laptops have been brought into the jail are that those laptops

25   are prepared, you know, by the government in consultation with

1   the defense first with safety protocols and internet-disabling

2   software, et cetera, and loaded with the discovery, but they are

3   not kept in the defendants' cells; and that's because the Bureau

4   of Prisons -- rightfully, I think -- views it as an unacceptable

5   safety risk for a laptop to remain in an inmate's cell.  And

6   those laptops instead are kept either in the unit or in the law

7   library, and so their function is to essentially increase the

8   number of available computers with a dedicated computer for that

9   inmate when that inmate is permitted to engage in discovery

10  review.

11          As a general matter, with respect to that type of an

12  arrangement, I think we don't have any objection to exploring

13  whether we can make that happen with the Bureau of Prisons.  The

14  sort of brief mention that defense counsel referenced in our

15  prior conversations related to a request for Mr. Tartaglione to

16  have a laptop in his cell, which we responded we knew the BOP

17  does not allow for safety reasons.

18          So we'd be happy to facilitate correspondence between

19  the Bureau of Prisons and the parties to ensure that everyone

20  understands the boundaries of what's permissible and what's not

21  and what can be accomplished and what can't, and we can perhaps

22  either jointly confer on a proposed order or perhaps an order

23  from the Court won't even be necessary.

24          MR. RYMSZA:  Judge, can I address -- can I respond to

25  that?

1           THE COURT:  Yeah, sure.

2           MR. RYMSZA:  And again, this is E.J. Rymsza.

3           Judge, first of all, I think to make some sort of

4  comparison to this case with just really run-of-the-mill other

5  cases would be inappropriate.  I mean, obviously, this is a

6  capital case.  The stakes couldn't be any higher.  I am

7  certainly not suggesting that, you know, while I would like

8  unfettered access for Mr. Tartaglione, I understand the

9  institution policies may preclude it.  I get that.  I mean,

10  obviously, there's things like they are not going to want to

11  have a cord accessible -- that's the first thing that comes to

12  mind -- to charge the laptop sitting around in Mr. Tartaglione's

13  cell.  And unlike some other cases, I realize the first stop for

14  any laptop would have to go to the U.S. Attorney's Office to,

15  you know, not only -- not only to make sure that the internet is

16  disabled, but make sure that the proper software to access all

17  of the discovery is downloaded on the device and, in fact, to

18  confirm that the discovery is clearly reviewable and accessible

19  prior to sending it to MDC.

20           The -- in some of these other cases what they have

21  done is that there is a specific time that the government would

22  send the laptop to the MDC officials, and they've kept the

23  laptop in -- and the charging wire -- in the office of that

24  designated individual, but -- but the goal here is that the

25  inmate would have really a maximum amount of access to be able

1  to use this laptop.  I'm not suggesting that the laptop has to

2  be with Mr. Tartaglione 24/7, but what we don't want also is,

3  you know, there is no point in having the laptop if you are

4  going to be denied access to it, and you are only going to be

5  given, you know, minimal amounts of time, and certainly, the --

6  you know, the prison may be able to control when and where that

7  is.  I get it.  But again, the whole point of him having it is

8  to be able to utilize it in an effective way and to, you know,

9  have the ability to review it, review the discovery, you know,

10 for multiple hours a day; and that may be at this point

11 inconsistent with MDC's requirements, but again, I think it

12 would sort of defeat of purpose of him having it if he was just

13 being given limited access to it.

14         So again, maybe I'm hopeful that we can reach an

15 agreement on this.  I think it's extremely important for

16 Mr. Tartaglione and really important for those of us on this

17 side.  So --

18         THE COURT:  All right.  So I think what makes sense is

19 before you submit your order, why don't you try to work

20 something out with the U.S. Attorney's Office and MDC, and the

21 order can reflect whatever it is that gets worked out.  If you

22 can't work it out, then you will submit a proposed order, and if

23 the government wants to submit its own order or a proposed

24 order, we can work out a schedule on that; but it seems to me in

25 the first instance, it would be better from your perspective if

1  it can all just be clarified and if there can be an agreement.

2  If not, then I am happy to referee the issue and see how we can

3  work something out.  Does that make sense?

4            MR. RYMSZA:  It does.  It does, Judge.  I mean, again,

5  the -- yes.  That's fine.

6            THE COURT:  Look, I certainly understand all of your

7  points, and you know, I will say to the government that it's

8  absolutely the case this is not a run-of-the-mill situation as

9  long as this remains a capital case, and that distinguishes it

10 from the vast majority of cases where people are being held at

11 the MDC.

12           And so I strongly encourage the government to work

13 with MDC and see if something can be resolved that gives

14 Mr. Tartaglione the access he needs and that also satisfies

15 MDC's security concerns.  All right?

16           MR. SWERGOLD:  Yes, Your Honor.  Certainly.

17           THE COURT:  Okay.

18           MR. RYMSZA:  Thanks, Judge.

19           THE COURT:  Okay.  Any other issues from the defense

20 perspective?

21           MR. BARKET:  I don't believe so, Your Honor.

22           THE COURT:  Okay.  And then in terms of scheduling our

23 next conference, Mr. Barket, what do you want to do in terms of

24 how far out we get together again?

25           MR. BARKET:  Any sense, Your Honor, as to when we can

1  all see each other again, either with or without masks?

2          THE COURT:  You mean in terms of it being in the

3  court?

4          MR. BARKET:  Yes.

5          THE COURT:  You know, if I had an answer to that, I

6  would be a gazillionaire.  Any one of us would be.

7          MR. BARKET:  I never thought I would miss the days of

8  having to put a tie on in the morning, but --

9          THE COURT:  Yeah, no.  I hear you.  Look, from what we

10 all read, you know, at least the early data from some of the

11 countries that were first hit with Omicron, it's been a steep

12 climb up and a steep climb down.  And from the articles I have

13 read, and if you all read different ones, then speak up, but it

14 suggests that the peak of this is going to happen sometime in

15 the next month, and that people hope to see the numbers come way

16 down.

17          I can't speak to, you know, what protocols the

18 marshals or the Bureau of Prisons or the court will adopt, but

19 it does seem as though there is reason to believe that we should

20 be able to get past the worst of this in the next, you know,

21 four to eight weeks.

22          MR. BARKET:  So I guess mid to late February then

23 makes sense.

24          THE COURT:  Okay.  So why don't we shoot -- yeah.  So

25 why don't we shoot for the last week of February, Dawn, if there

1   is a date that we can propose to everybody?

2          MR. BARKET:  Not the week of the 21st, please.  I

3   think that's President's week, and if COVID permits, I'm

4   supposed to take my children someplace that week.

5          THE COURT:  Okay.  So then the week of the 28th, which

6   should be into the first week in March, and we are scheduled to

7   be on trial that week is the only issue, but who knows.

8          THE DEPUTY CLERK:  Judge, do you want to schedule that

9   week?

10         THE COURT:  I mean, right now we are on trial, so we

11  can't do anything, it seems to me.  We can try something

12  tentative, and then we may have to move it back, Mr. Barket,

13  okay, if the trial is going to go forward.

14         MR. BARKET:  Okay.

15         THE DEPUTY CLERK:  We can do March 3rd at 10:00.  Oh,

16  I am sorry.  That's --

17         MR. BARKET:  Oh, I have a sentencing in the Northern

18  District that day that's going to require a personal appearance,

19  and that's going to be up in Binghamton, I think.  So --

20         THE COURT:  Okay.

21         MR. BARKET:  I can do the week before the 21st if

22  that's helpful, the week of the 5th, somewhere in there or --

23         THE COURT:  We could do that.  I just don't know what

24  the numbers are going to be like.  I mean, we can tentatively

25  schedule that and see where we are at.

```
 1            MR. BARKET:  Actually, I mean, March 1st is our -- is
 2   the first deadline for motions, if any, so it might be
 3   interesting to see where we are in terms of that.  So maybe
 4   after March 1st makes sense, even if it's the following week.  I
 5   don't know how long the trial is going to go.
 6            THE COURT:  Yeah, I can't do the following week, so it
 7   might have to be the week after that.
 8            MR. BARKET:  Okay.  That's okay with us.
 9            THE COURT:  The week of the March 14th.
10            Dawn, maybe the middle of that week?
11            THE DEPUTY CLERK:  We are actually full in the
12   mornings.  I don't know if they would do afternoon from the
13   facility yet.  The only day that we are open is the 4th.
14            THE COURT:  Okay.  We can try -- can somebody please
15   mute?  Somebody is not muted, and we are getting background
16   noise.
17            All right.  So why don't we say then tentatively we
18   will say March 14th at 10:00.  Does that not work for anybody?
19            MR. RYMSZA:  Judge, this is E.J. Rymsza.  I'm sorry.
20   I do have something here at 9:00, a pretrial hearing that will
21   last a few hours.  And by the way, are we talking about this is
22   telephonic or this is in person?
23            THE COURT:  No.  I think the hope is that we will be
24   in person.
25            MR. RYMSZA:  Okay.
```

 1          THE COURT:  You know, we can't say for sure, but

 2  that's the hope.

 3          MR. RYMSZA:  Definitely cannot do the 14th.

 4          THE COURT:  Okay.  All right.  Dawn, we are booked in

 5  the mornings you say in the rest of that week?

 6          THE DEPUTY CLERK:  We are booked Tuesday, Wednesday,

 7  all day.  Thursday the 17th, we have two sentences in the

 8  morning.

 9          THE COURT:  Will somebody please mute in the

10  background?  Mr. Barket?

11          MR. BARKET:  Yes.  Looking at the schedule again, if

12  there is going to be a motion concerning the discovery, it will

13  be fully briefed by March 22nd.  So maybe it makes some sense to

14  have it just after that, and if necessary, there can be some

15  discussion concerning it.

16          THE COURT:  Okay.  Yeah, you've got to give me some

17  time to read the reply brief and then --

18          MR. BARKET:  Right, right, right.

19          THE COURT:  -- get my thoughts together.  So then --

20          MR. BARKET:  Even the following week, the week of the

21  28th is okay, and the only thing that will come up between now

22  and then will be the issue concerning the laptop and potentially

23  social visits, but we can address that --

24          THE COURT:  We can handle those.

25          MR. BARKET:  -- by phone or by paper.

1            THE COURT:  Okay.  So, Dawn, maybe that last week in

2   March.

3            THE DEPUTY CLERK:  Is Tuesday good for you or is that

4   too late?  I can do Monday or Tuesday.

5            THE COURT:  Let's do Tuesday.  Tuesday, what date is

6   that, then?

7            THE DEPUTY CLERK:  The 29th.

8            THE COURT:  Does March 29th not work for anybody?

9            All right.  Sounds like that works.  So let's say

10  March 29th at 10:00.  We will assume it's in person, and we may

11  be taking up the discovery motion and any other issues.  Of

12  course, in addition, if nothing else, we will use it as a status

13  conference.

14           Any objection to excluding time until then?  Again --

15           MR. BARKET:  No.

16           THE COURT:  -- I made a finding that the case is

17  complex, and there are pending motions, but -- all right.  I

18  will prospectively exclude time from now until March 29th of

19  2022 finding it's in the interests of justice to do so.  That

20  finding is based on the fact that this is a complex case; there

21  is a lot of pretrial work to be done ranging from motions to

22  trial prep to applications being made to the Justice Department.

23  I find that the interests of justice in this exclusion outweigh

24  the public's and Mr. Tartaglione's interest in a Speedy Trial.

25  The finding is made pursuant to 18 U.S.C. Section 3161(h)(7)(A).

1          With respect to the schedule, obviously, I defer to

2    you all on all the pretrial stuff, so we will adopt the

3    schedule.  What I am here to tell you is I am disinclined to

4    allow anything more than a day or two between guilt and penalty

5    phase, and I am giving that you heads up now so that you are not

6    surprised to hear that later on in the year.  And I say that out

7    of respect for the jury's time.  So you can yell at me later,

8    and I am not making a final ruling, but that's where I am at

9    right now.

10          Anything else, government?

11          MR. SWERGOLD:  No.  Thank you, Your Honor.

12          THE COURT:  Anything else from the defense side?

13          MR. BARKET:  No.  And I want to promise never to yell

14   at you, Judge.

15          MR. SCHWARTZ:  Your Honor --

16          THE COURT:  Yes?

17          MR. SCHWARTZ:  If I may?  Good morning.  I have yet to

18   address the Court.  This is Carl Schwartz on behalf of

19   Mr. Tartaglione.

20          THE COURT:  Good morning, Mr. Schwartz.

21          MR. SCHWARTZ:  And first let me extend my apologies

22   for not being able to make this.  I haven't been in New York,

23   and I'm glad that we are able to do it on the telephone.  I can

24   assure the Court that if that is the Court's position in regard

25   to the penalty phase, that the Court will receive a submission

22

1  in that regard.  I think at the very least in a case like this,

2  based on factors that I would be happy to lay out at the

3  appropriate time, I think at the very least the week that the

4  government suggests is appropriate and reasonable.  I just

5  wanted to give the Court a heads up as to that just to let the

6  Court know that's our position.

7          THE COURT:  Sure.  Yeah, that's fine.  And just when

8  you write your submission, please incorporate my position, which

9  is that this case has been pending for a long, long time, and

10 there is a lot of prep time between now and then that people are

11 going to have.  So it's not unheard of to have the penalty phase

12 start the day after the verdict and a guilt phase, and I can say

13 that from personal experience.  So if you want to factor that

14 into whatever it is you submit, that would be very helpful.

15         MR. SCHWARTZ:  Yes, sir.

16         THE COURT:  All right.  Anything else?  All right.

17 Then we are adjourned, and please enjoy the rest of the day.

18 Please stay warm, everybody, and please stay healthy.

19                          -o0o-

20

21         I, Darby Ginsberg, certify that the foregoing is a

22 correct transcript from the record of proceedings in the

23 above-entitled matter.

24     /s/ Darby Ginsberg

25

OFFICIAL COURT REPORTER
DARBY GINSBERG, RPR (914) 390-4102