

**The New York Times Company**

Al-Amyn Sumar
Legal Department

T 202 862 7705

al-amyn.sumar@nytimes.com

620 8th Avenue
New York, NY 10018
nytimes.com

April 30, 2026

**<u>VIA EMAIL</u>**

The Honorable Kenneth M. Karas
United States District Judge
United States Courthouse
300 Quarropas St.
White Plains, NY 10601

Re:     <u>*United States v. Tartaglione*, 16-cr-832 – Unsealing of Judicial Records</u>

Dear Judge Karas:

I write on behalf of The New York Times Company and reporters Benjamin
Weiser, Jan Ransom, and Steve Eder (together, "The Times") to seek unsealing
of certain judicial records in this proceeding against Nicholas Tartaglione. The
Times filed an unsealing application in this case once before, in September 2019,
to seek records related to Mr. Tartaglione's request to be transferred to another
detention facility. The Times now returns to this Court to seek access to four
particular sets of documents, pursuant to the public's common law and
constitutional rights of access:[1]

   (1) A suicide note purportedly authored by Jeffrey Epstein, recovered by Mr.
       Tartaglione, and then reportedly submitted by Mr. Tartaglione's
       attorneys in this case (the "Note");
   (2) The report by Bobbi Sternheim, *Curcio* counsel for Mr. Tartaglione,
       submitted to the Court in January 2020 (the "Report"), *see* Dkt. 179;
   (3) The transcripts of the "multi-day hearing" conducted by the Court as part
       of its *Curcio* inquiry (the "Transcripts"), *see* Dkt. 260; and
   (4) The March 1, 2021, order issued by the Court following its *Curcio*
       inquiry, which resulted in the disqualification of one of Mr. Tartaglione's
       attorneys (the "March 1 Order"), along with any other rulings related to
       the inquiry.

---

[1] The right of access is an affirmative, enforceable public right, and the standing
of the press to enforce it is well settled. *See, e.g., Globe Newspaper Co. v.
Superior Court*, 457 U.S. 596, 609 n.25 (1982); *Hartford Courant Co. v.
Pellegrino*, 380 F.3d 83, 91 (2d Cir. 2004).

The Times respectfully requests that the Court act immediately to unseal the Note. Mr. Tartaglione has already divulged the contents of the Note, so there is nothing left to keep secret. And the public interest in the Note's disclosure is immense. Congress's passage of the Epstein Files Transparency Act, and subsequent public discussion of materials released pursuant to that law, underscores an ongoing and urgent interest in Mr. Epstein's case, including the circumstances surrounding his pretrial detention and death.

The other records requested should also be unsealed, at least in part. Though there may be portions of the Report, the Transcripts, and the March 1 Order (and other rulings) that could properly be redacted, some information within them has already been publicly disclosed. Certain other portions of the records could likely be released without revealing privileged information.[2]

A. Background

Mr. Tartaglione, a former police officer, was charged with crimes relating to his murder of four men in April 2016. Karen Zraick, *Police Officer With Bit Part in Epstein Jail Drama Is Convicted of Murder*, N.Y. Times (Apr. 6, 2023), https://nyti.ms/4exSb1p. Though prosecutors initially said they would seek the death penalty, that decision was reversed at the direction of then-Attorney General Merrick Garland. *Id.* On April 6, 2023, Mr. Tartaglione was found guilty by a jury on all counts charged, and on June 10, 2024, this Court sentenced him to four consecutive terms of life imprisonment. Dkt. Entries for April 6, 2023, and June 10, 2024. His appeal is currently pending at the Second Circuit. *United States v. Tartaglione*, No. 24-1852 (2d Cir.).

Notably, and relevant here, Mr. Tartaglione was briefly Mr. Epstein's cellmate at the Metropolitan Correctional Center (MCC) while the two men were awaiting their respective trials. Ali Watkins, Danielle Ivory & Christina Goldbaum, *Inmate 76318-054: The Last Days of Jeffrey Epstein*, N.Y. Times (Aug. 17, 2019), https://nyti.ms/4dZkq96. It was during this period, in July 2019, that Mr. Epstein reportedly attempted, unsuccessfully, to die by suicide. *Id.* Mr. Epstein was found unconscious in his cell with marks on his neck; he was then removed from the cell and placed under suicide watch. *Id.* Mr. Epstein claimed he had not attempted suicide and instead alleged that Mr. Tartaglione had assaulted him, an accusation Mr. Tartaglione denied. *Id.*

---

[2] The public docket makes it difficult, and often impossible, to identify the nature of the other documents filed under seal in this case. The Times may seek unsealing of additional materials at a later date.

In September 2019, The Times filed an application to unseal judicial records in this case. Dkt. 156. That application concerned a request Mr. Tartaglione made to this Court to be transferred from the MCC to another facility, based in part on alleged threats to his safety from MCC guards who, Mr. Tartaglione claimed, tried to keep him from speaking up about Mr. Epstein's suicide attempt. Dkt. 147. The Government sought to keep filings related to Mr. Tartaglione's request under seal. *See* Dkts. 151, 152. It argued that these filings are not judicial documents because they have "no bearing on the charges contained in the pending indictment" and instead address a matter "ancillary to his criminal prosecution." Dkt. 151 at 1; Dkt. 152 at 1. The Times and other outlets argued otherwise. *See* Dkts. 155, 156. What makes an item a judicial document is not whether it "directly affects" a prosecution but what role it plays in the performance of a judicial function. Dkt. 156 at 2 (cleaned up). In seeking a transfer from MCC, The Times argued, "Mr. Tartaglione expressly called upon the Court to exercise its adjudicatory power over a matter within its purview." *Id.* at 3. And the Government had failed to make the showing required to overcome the public's common law and First Amendment rights of access. *Id.* at 4-6. The Court sided with The Times and other outlets and ordered the materials unsealed. Dkt. 162.

The instant unsealing application concerns a separate pretrial matter in Mr. Tartaglione's prosecution that also relates to Mr. Epstein: the *Curcio* inquiry.[3] The records and proceedings of that inquiry have been almost entirely sealed. But certain aspects of the relevant procedural history can be gleaned from the docket. Among them:

- In August 2019, the Court appointed Bobbi Sternheim as Mr. Tartaglione's *Curcio* counsel. Dkt. 148.

- On January 8, 2020, the Court issued an order stating that Ms. Sternheim had prepared the Report in her capacity as *Curcio* counsel. Dkt. 179.

- In the months that followed, the Court conducted an evidentiary hearing as part of its *Curcio* inquiry. *See* Dkt. 226; Dkt. Entry for May 21, 2020; Dkt. 237. The dates of the hearing are not entirely clear from the docket.

---

[3] This inquiry, named for the Second Circuit's decision in *United States v. Curcio*, 680 F.2d 881 (2d Cir. 1982), entails a set of procedures used by a district court to "secure a knowing, voluntary, and intelligent waiver from the defendant of his right to a non-conflicted attorney." *United States v. Lussier*, 71 F.3d 456, 461 (2d Cir. 1995).

- On May 25, 2021, following that "sealed, multi-day hearing," the Court outlined its findings in a one-page ruling. Dkt. 260. The Court disqualified one of Mr. Tartaglione's attorneys, John Wieder, based on an actual, unwaivable conflict of interest; ruled that the conflict could not be imputed to Mr. Tartaglione's other retained lawyers; found that any conflicts on the part of these other lawyers were potential, waivable conflicts; and that Mr. Tartaglione had knowingly and voluntarily waived those conflicts. *Id.* This ruling cites the earlier March 1 Order and indicates that it was "filed under seal," but the March 1 Order does not appear on the public docket. The Times does not know whether the Court issued other rulings related to the *Curcio* inquiry under seal.

The *Curcio* inquiry is one of the issues that Mr. Tartaglione is raising on appeal. His arguments on that subject are to be contained in a sealed brief. But his prior appellate filings reference the inquiry. One filing notes that this Court was alerted to potential conflicts of interest by certain attorney-members of Mr. Tartaglione's defense team, that "at least four areas" of potential conflicts were identified, that *Curcio* counsel was appointed "to prepare a report for the court," and that the proceedings were sealed in order to protect privileged communications between Mr. Tartaglione and his attorneys. Dkt. 64-2 at 2, *United States v. Tartaglione*, No. 24-1852 (2d Cir. Feb. 12, 2026).

B.  Post-Trial Disclosures About the Note

Over the last year, one issue apparently examined in the *Curcio* inquiry — how Mr. Tartaglione and his attorneys handled the Note — has become a subject of public record. That is primarily because of disclosures made by Mr. Tartaglione himself. But his disclosures are also corroborated by a document released by the Department of Justice ("DOJ") in December 2025 pursuant to the Epstein Files Transparency Act.

Mr. Tartaglione has discussed the Note in detail in interviews with *The New York Times* and another outlet. In one interview last year with Jessica Reed Kraus, an independent writer with a popular Substack newsletter,[4] Mr. Tartaglione

---

[4] The newsletter, titled House Inhabit, has nearly 450,000 subscribers. https://substack.com/@houseinhabit. Ms. Kraus also has 1.2 million followers on Instagram. https://www.instagram.com/houseinhabit.

discussed not just the contents of the Note but also the fact that it was submitted in this proceeding.[5]

Among the matters he covered are these:

- The submission of the Note to this Court: "Jeffrey Epstein tried killing himself when he was in the cell with me. I woke up, I brought him back with CPR. And to prove this point, Jeffrey Epstein wrote a suicide note. Judge Karas, the presiding judge over my case, ordered my friend and attorney, John Wieder, to bring in the suicide note that Jeffrey Epstein wrote and give it to the court. That note is in, I guess, Judge Karas's possession right now." (00:27-00:56.)

- The content of the Note: "He said, um, it said something like, FBI, uh, you know, looked into me for months and found nothing. Then he wrote, what do you want me to do? Cry about it? And it was weird, because he wrote a smiley face. And then he wrote, time to say goodbye." (01:02-01:18.)

- His lawyers' attempts to authenticate the Note: "And my lawyers at the time wanted to make sure, you know, I didn't write it or all this stuff, so they had, they had handwriting experts look at it and everything." (01:19-01:28.)

- His discovery of the Note: "[The Note] was in my book, yeah, when I got back into the cell, I opened my book to read, and there it was. And he wrote it and stuck it in the book. And that was, I believe, the reason why he stopped saying, uh, because he didn't want to go to suicide watch, because I think his first thing was, oh yeah, he tried to blame me for attacking him." (01:45-02:04.)

In recent interviews with journalists at *The New York Times,* Mr. Tartaglione provided an account consistent with the above.

But these disclosures by Mr. Tartaglione do not stand on their own. His account is corroborated by a two-page document that was released by the DOJ in an early

---

[5] Ms. Kraus posted audio of the recording on her Substack: https://jessicareedkraus.substack.com/p/epsteins-cellmate-yes-he-killed-himself. The relevant statements by Mr. Tartaglione are contained in the second audio file on that webpage, titled, "Nick Tartaglione July 7: 'He Killed Himself.'" The timecodes listed below correspond to that audio file.

tranche of the Epstein files in December 2025. The document, which is accessible on the DOJ's website[6] and enclosed with this letter, is titled "Chronology." It is not clear who authored the document or for what purpose. But the document appears to have been prepared by someone involved in or at least familiar with the *Curcio* inquiry, given that it recounts the case's procedural history and refers to attorneys by their initials. In any case, the contents of the document match details of the account Mr. Tartaglione has provided, including that Mr. Tartaglione found the Note in a book, that his attorney Mr. Wieder had possession of the Note, and that his attorneys made attempts to authenticate the Note.

C. The Court Should Unseal the Requested Records

There is no basis for continued blanket sealing of the requested records. The ostensible basis for the sealing was to protect confidential, privileged communications between Mr. Tartaglione and his attorneys. But Mr. Tartaglione has now waived that privilege, at least for certain information. While other information in the records could be properly redacted, any such redactions must be narrow and consistent with the common law and First Amendment rights of access.

As a preliminary matter, there is no doubt that this Court has jurisdiction to resolve sealing disputes despite Mr. Tartaglione's appeal. "It is well-established that notwithstanding a pending appeal, a district court retains residual jurisdiction over collateral matters," including sealing of the district court's own records. *Vida Longevity Fund, LP v. Gold*, 2025 U.S. Dist. LEXIS 218289, at *6-7 (E.D.N.Y. Nov. 5, 2025) (quoting *Tancredi v. Metropolitan Life Ins. Co.*, 378 F.3d 220, 225 (2d Cir. 2004) (cleaned up)); *accord, e.g.*, *United States v. Schulte*, 2024 U.S. Dist. LEXIS 65969, at *1 n.1 (S.D.N.Y. Apr. 9, 2024) ("Schulte has appealed his conviction and sentence. Nevertheless, the Court retains jurisdiction to address the issue of sealing."). That the *Curcio* inquiry is a subject of Mr. Tartaglione's pending appeal does not change that; it should be this Court, not the Second Circuit, that decides in the first instance whether filings on its docket remain under seal.

That leaves two issues: whether there is a public right of access to the records requested here, and whether the blanket sealing of records comports with that right. The answer to the first question is yes; the answer to the second is no.

---

[6] https://www.justice.gov/epstein/files/DataSet%208/EFTA00018224.pdf.

1.  *The public has a compelling right of access to the records requested here*

The right of access to court records and proceedings has two sources: the common law and the First Amendment. *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119-20 (2d Cir. 2006). A common law presumption of access attaches to all "judicial documents," which are any items "relevant to the performance of the judicial function and useful in the judicial process." *Giuffre v. Maxwell*, 146 F.4th 165, 176 (2d Cir. 2025) (cleaned up). The common law presumption varies in weight, depending on "the role of the material at issue in the exercise of Article III judicial power" and "the resultant value of such information to those monitoring the federal courts." *Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 142 (2d Cir. 2016) (cleaned up). To overcome the presumption, the proponent of sealing must demonstrate "countervailing factors" that warrant abridging access. *Id.* at 143.

A distinct — and stronger — First Amendment right exists for a subset of judicial documents. There are two approaches for determining whether that right exists in a given case. The first is the "experience and logic" analysis: the court asks whether public access has been historically available (the "experience" prong) and would be valuable to the process in question (the "logic" prong). *Lugosch*, 435 F.3d at 120. The second approach "considers the extent to which the judicial documents are derived from or a necessary corollary of the capacity to attend the relevant proceedings." *Id.* (cleaned up); *accord, e.g.*, *Newsday LLC v. County of Nassau*, 730 F.3d 156, 164 (2d Cir. 2013). The constitutional presumption does not vary in weight based on the circumstances. *See, e.g.*, *Newsday*, 730 F.3d at 165. Where the First Amendment right applies, it is overcome only where the court makes "specific, on-the-record findings" that sealing "is essential to preserve higher values and is narrowly tailored to serve that interest." *Bernstein*, 814 F.3d at 144-45 (cleaned up).

The records sought here are plainly judicial documents, subject to a particularly "strong" presumption of access under the common law. *Lugosch*, 435 F.3d at 121. That conclusion is most obvious for the March 1 Order and other rulings from the *Curcio* inquiry, since a court's own orders are the paradigmatic judicial documents. "A court's decrees, its judgments, its orders, are the quintessential business of the public's institutions." *Hardy v. Equitable Life Assur. Soc'y of the United States*, 697 F. App'x 723, 725 (2d Cir. 2017) (summary order) (quoting *EEOC v. Nat'l Children's Ctr., Inc.*, 98 F.3d 1406, 1409 (D.C. Cir. 1996)); *see also Joy v. North*, 692 F.2d 880, 892 (2d Cir. 1982) ("An adjudication is a formal act of government, the basis of which should, absent exceptional circumstances, be subject to public scrutiny.").

The same is true for other records requested here. Though the full circumstances surrounding the *Curcio* inquiry are not clear from the docket, each set of records — the Report, the Transcripts, and the Note — was, at the very least, relevant to the inquiry. The Report, prepared by *Curcio* counsel, was apparently prepared for the Court and intended to provide it with facts or analysis of the issues examined in the inquiry. The Transcripts would, at a minimum, reflect testimonial evidence presented to the Court in aid of its decisionmaking. And the Note appears to have been an important piece of documentary evidence in the inquiry. That can be surmised from the fact that, according to Mr. Tartaglione, the Court ordered his prior attorney to submit the Note to the Court.

Whether the Court ultimately relied on the Note, the Report, or the evidence reflected in the Transcripts in reaching its decision is immaterial to the question of whether those materials are judicial documents. The test for a judicial document is whether it "would reasonably have the *tendency* to influence a district court's ruling on a motion" or other adjudication. *Giuffre*, 146 F.4th at 178 (quoting *Brown v. Maxwell*, 929 F.3d 41, 49 (2d Cir. 2019) (cleaned up)). And because these documents were submitted as part of a proceeding that determined Mr. Tartaglione's "substantive legal rights," they, like the March 1 Order, are subject to a "strong" common law presumption of access. *Lugosch*, 435 F.3d at 121.

The more stringent First Amendment right also applies to the *Curcio* proceedings and to all of the records sought by The Times here. The proceedings themselves satisfy the experience and logic test, as another federal court has found. *See Applications of National Broadcasting Co.*, 828 F.2d 340, 345 (6th Cir. 1987) ("*NBC*"). In *NBC*, news organizations sought access to sealed records of pretrial criminal proceedings, including records of an "inquiry concerning conflicts of interest faced by the attorneys for the three defendants." *Id.* at 341. The district court sealed the records on the ground that their release could have prejudiced the defendants' right to a fair trial, but the Sixth Circuit vacated that ruling. *Id.* at 347. It found that "proceedings inquiring into conflicts of interest by attorneys meet and satisfy the requirements of a qualified First Amendment right of access." *Id.* at 345.[7] The Sixth Circuit remanded to allow the district court to

---

[7] In *NBC*, the Government moved for a conflicts-of-interest inquiry under Federal Rule of Criminal Procedure 44(c). 828 F.2d at 345. But the court's legal reasoning was not limited to that particular form of inquiry. And even so, the First Amendment analysis focuses on the history of access to a document or proceeding based on its substance, not on its precise form or the label attached to it. *See, e.g.*, *N.Y. Civ. Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 301 (2d Cir. 2011) ("The *Richmond Newspapers* test looks not to the formal description of the forum but to the historical 'experience in that *type* or *kind* of

consider whether that right was overcome in the circumstances, but it noted that the bar for such a finding was high. *Id.* at 346-47. This Court should adopt the reasoning of the *NBC* court here and find that the constitutional right likewise applies to *Curcio* proceedings.

The constitutional presumption of access also extends to all of the records sought here, which are either derived from or a necessary corollary of the capacity to attend the *Curcio* proceedings. That is undeniable for the Transcripts, as "[t]he transcript of a proceeding is so closely related to the ability to attend the proceeding itself that maintaining secrecy is appropriate only if closing the courtroom was appropriate." *Newsday*, 730 F.3d at 165. The same is true for the March 1 Order, which reflected the Court's ultimate decision and exercise of adjudicatory power following the proceedings. And the other documents — the Note and the Report — either consist of or discuss evidence that would have been examined at the hearing. *Cf., e.g.*, *United States v. Akhavan*, 532 F. Supp. 3d 181, 186 (S.D.N.Y. 2021) (finding that remote observers of a trial have a First Amendment right to trial exhibits because they "were a necessary corollary of the capacity to attend the trial" (cleaned up)).

2. *The continued blanket sealing of the records does not comport with either the common law or First Amendment rights of access*

Whether the Court analyzes the sealing under both rights of access or only the common law right, it should revisit the blanket sealing of the requested records. The Times does not know whether the Court issued specific, on-the-record findings when it placed these records under seal, or when it closed the courtroom for the multi-day hearing. But if the purpose of sealing was to prevent the disclosure of confidential attorney-client communications, that rationale no longer holds for the information Mr. Tartaglione has publicly disclosed. *See, e.g.*, *In re Horowitz*, 482 F.2d 72, 81 (2d Cir. 1973) ("Subsequent disclosure to a third party by the party of a communication with his attorney eliminates whatever privilege the communication may have originally possessed, whether because disclosure is viewed as an indication that confidentiality is no longer intended or as a waiver of the privilege."). It may be that certain portions of the records — with the exception of the Note, whose contents Mr. Tartaglione has divulged — can properly be redacted. But any such sealing must be justified by higher values and narrowly tailored to those values.

We thank the Court for its consideration.

---

hearing throughout the United States.'" (quoting *El Vocero de Puerto Rico v. Puerto Rico*, 508 U.S. 147, 150 (1993))).

Respectfully submitted,

Al-Amyn Sumar

Enclosures

cc:    All counsel of record (via email)

The Parties are to respond to this letter by May 4, 2026.  No extensions will be granted.

So Ordered.

4/30/26

**Chronology**

| Date | Event | Source |
|---|---|---|
| 7/3/19 | Contraband phone seized from NT | |
| 7/6/19 | JE booked into MCC | |
| 7/23/19 | JE found unresponsive in cell w/NT and calls guard | |
| | JE and NT removed from cell and search executed | BS assumes correct |
| | JE claims NT assaulted him | BE assumes |
| | JE on suicide watch | |
| 7/23/19 through 7/27/19 | Sometime between 7/23 and 7/27, NT found the note | |
| 7/24/19 | BB gets messages from NBC re: claims against NT | |
| 7/25/19 | News outlets carry story NT assaulted JE | |
| | Client OK's BB talking to press and he refuted JE's claim and attacked prison conditions | |
| | TR disagreed with that decision | |
| 7/27/19 | BB visited NT and NT told him JE left him a note in his book. Asked guard if NT could go retrieve it and guard said no. BB told NT to give it to next lawyer that visits him. | BB response/TR seems to corroborate that NT told BB the note was in **his** book |
| | BB called JW, who was going to visit later that day and told him he would be getting a doc from NT | BB response |
| | JW went later that day and NT gave him the note, which he still has. | BB response |
| 7/28/19 | BB's first investigator said he could not authenticate the note | BB response |
| 7/29/19 | BB's second investigator said he could not authenticate the note | BB response |
| 7/29/19 | BB advised TR about the note and what to do. | BB response, which seems to be corroborated by TR |
| 7/29/19 | JE removed from suicide watch and placed in different cell (not with NT) in SHU | |
| 7/30/19 | BB's co-counsel spoke with TR again and read note to him. BB spoke w/TR twice and TR also raised concerns re: authenticity of note. | BB response |
| 8/2/19 through 8/6/19 | BB and co-counsel away and no discussions re: note | BB response |
| 8/9/19 | NY cleared of causing JE's injuries | |
| 8/10/19 | JE found dead in his cell | |

EFTA00018224

| | | |
|---|---|---|
| 8/21/19 | Sternheim appointed | |
| 8/23/19 | Disclosure of note to trial team w/BS present. He revealed he visited NT and NT told him a letter was left in my book, etc. BS saw note on the phone that day. | TR |
| 11/10/19 | CNN report: BB quoted saying "notion Epstein was murdered is ridiculous." Also, said MMC guards threatened NT to "shut up" and "stop talking." In a letter to Judge Karas, BB wrote the message is that if NT conveys info about the facility or about JE's recent suicide, there will be a price to pay. Also complained about deplorable conditions at MCC. | |
| 1/5/20 | BB appeared on 60 Minutes and said NT had info on prison conditions, JE's attempted suicide and JE's suicide. | 60 Minutes video on line. |
| | Recently, BB authenticated note (1/5/20 60 Minutes show has another note on line. | Ross letter |
| 1/8/20 | Sternheim report available for pick up | |
| 1/16/20 | Barket Response to Sternheim report | |

2

EFTA00018225